We'll hear argument first this morning in case 17-532, Herrera v. Wyoming. Mr. Hicks. Thank you, Mr. Chief Justice, and may it please the Court. In 1868, the Crow tribe of Indians agreed to cede to the United States 30 million acres of its aboriginal land and move to a reservation. In exchange for ceding its land, the tribe expressly reserved the right to hunt on that ceded land. The text of the 1868 treaty memorializing this agreement explicitly identifies the four events that would cause the hunting right to terminate. Wyoming's admission to the Union is not among them. Therefore, the only way that Wyoming statehood could have terminated the hunting right is by implication, but that is the very theory that this Court repeatedly rejected in Minnesota v. Mule Lac Band of Chippewa Indians. And while the treaty does provide that the right would terminate if the lands were no longer unoccupied, President Cleveland's 1897 proclamation creating the Bighorn National Forest did not suddenly render all 1.1 million acres of the land comprising the forest occupied as the parties to the treaty understood that term. As a result, the treaty right has not terminated, and Petitioner should have been Before this Court, Wyoming largely disregards Mule Lacs and urges this Court to rely on its 1896 decision in Ward v. Racehorse. But Mule Lacs repudiated the reasoning that led to the outcome in Racehorse, from Racehorse's reliance on the equal footing doctrine to its characterization of treaty rights as temporary and precarious to its belief that statehood Why isn't your client bound by the judgment of the Tenth Circuit in Repsis, and in particular, its disposition of the question whether the land is occupied? Justice Alito, a few responses for that. First of all, the issue of whether the Tenth Circuit's alternative determination has preclusive effect was not pressed or passed on below. There is nothing in the decisions of the State courts that address the preclusive effect of that alternative determination. And this Court typically does not address questions from State courts that have not been pressed or passed below. So that would be available to the State to argue on remand if you were to prevail on the other issues? Well, I think that the State has likely forfeited that as a matter of State law, but I also think that there are other reasons why an exception to preclusion would not apply. I mean, primarily What's your best reason? Primarily, it's that the tribe did not have a full and fair opportunity to litigate this issue in Repsis because it was not raised in the Repsis district court. It was raised for the first time in the court of appeals, and the court of appeals' determination in the first instance was not only one of several alternative determinations. It wasn't subject to plenary appellate review. Well, those are several reasons. There was not a fair opportunity to raise the issue in the Tenth Circuit. Well, I think that there was not the full and fair opportunity to litigate that question that this Court requires before it gives its decision. Why not? Why not in the Tenth Circuit? Why didn't they have a fair and – a full and fair opportunity in the Tenth Circuit? Well, to begin with, I don't know if the rule of law – They didn't allow briefs? They didn't allow arguments? They didn't want to listen to anything that – that the tribe had to say? Well, primarily because this particular argument that the creation of the national tribe had occupied so that the treaty right was terminated was, I believe, one page of Wyoming's response brief in – on an issue that was never raised in the district court. And so the only thing that the tribe had to respond to that was limited space in a reply brief where it had to respond to all of the other arguments that Wyoming had made, principally on the issue that the district court had actually addressed. Could you – Are you asking us to decide that issue, or are you asking us to remand on that issue? I think there are several reasons why you can decide that there was no preclusive effect to the Tenth Circuit's determination, among them that it was forfeited, among them that it was not a full and fair opportunity so that it qualifies for that exception, but also that that particular determination in the first instance was not subject to the plenary appellate review this Court requires. If your primary argument is that it was forfeited, and I think you have some good grounds for thinking that, but given that that is a State law matter, why wouldn't we remand to the Wyoming courts to decide that forfeiture question? Well, because I think typically what this Court does when an issue has not been raised or pressed on below is it – is it doesn't allow the consideration of it here. So I don't think there's any reason to remand for consideration of that in the first instance. But I think you can go on to address that, you know, as a matter of an exception to preclusion law. I mean, I think that there are several reasons why that wouldn't be given preclusive effect. Sotomayor, I'm a little confused. What was forfeited when? You didn't – you're arguing you didn't get a fair and full opportunity to litigate this in repsis? In repsis there wasn't a fair opportunity? That – it is that the tribe did not have the required full and fair opportunity of amongers. So is that because when the Tenth – I thought the Tenth Circuit there asked for further briefing, correct? No, they did not, Your Honor. There was no further briefing in the – you're thinking of the decision below. Right. In the Wyoming State courts asked for supplemental briefing on whether there was issue preclusion. And in response, the State of Wyoming in this case did not ever raise this as a ground for why there should be preclusive effect given to anything in the repsis litigation. Well, I'll tell you what troubles me about your position here and your argument that we should decide these issue preclusion questions. This is like a little, you know, a couple of classes in law school on issue preclusion. And you and the – and the government have raised significant issue preclusion arguments that we're going to have to decide in this case involving a misdemeanor criminal conviction. Well, Justice Alito, I think those are actually good reasons to find that there are – you can apply the well-established exceptions. I mean, the foreign fair office— Well, I don't know that they are well – I don't know that they are well-established. The exception that when a judgment is raised, it is based on two alternative grounds, it's not – there's no issue preclusion on either ground, that's well-established? Hasn't that been rejected by six circuits? No, Your Honor, that is incorrect. Actually, if you look at the footnote in our reply brief, seven circuits have actually accepted the restatement's rule. I know that the State's brief says— Well, we haven't accepted it, have we? No, this Court has not addressed it, but it actually goes part and parcel with what this Court has said about the critical importance of giving plenary appellate review to determinations. I mean, it seems to me like a significant question, and I was underwhelmed by the reasons given in the comment to the provision of the restatement on this question. Well, I think that, first of all— The first reason they give is that when a court says, our judgment rate is based on two alternative grounds, and either one is independently sufficient, that shouldn't have – that shouldn't have issue preclusion effect, because really the Court may not have seriously – you know, the Court may not have been accurate in saying each one is independently sufficient. Do you find that to be a particularly strong argument? Well, I think that it's an exception that applies in narrow circumstances. You have to have an alternative determination decided in the first instance. And I think that, frankly, the Tenth Circuit's decision here proves the policy underlying it. I mean, I don't – there's not a great defense of the Tenth Circuit's determination on the merits, and I think that's demonstrated by the fact that there was such limited briefing. It was only raised in the Tenth Circuit in one page of briefing. The Tribe, you know, only had a very limited amount of its reply brief. So I think when you combine, you know, the policies underlying the full and fair opportunity, in addition to the fact that it's an alternative determination in the first instance, I think the Tenth Circuit's determination is, you know, demonstrating why the restatement exception exists. And again, it's a very narrow – Counsel, counsel, I'll spot you there. I mean, it's a little curious that – now, I don't wish to fault my own court, but the Tenth Circuit decided that the land was occupied by the Federal Government as an alternative holding without hearing from the Federal Government, who now disclaims the idea that they occupied the territory. So I take your point. But do we have to get into any of this issue preclusion stuff at all? If this issue wasn't raised by the district, passed on by the district court, relied on by the district court, in this proceeding, why should we enmesh ourselves in the excellent Wyoming law of issue preclusion? Well, Justice Gorsuch, I don't think you need to get into that. I think you can advance to the merits and decide the merits questions before you. Let's do that. Talk to us about that. I would be happy to do that, because, you know, if you go back to this Court's decision in Mielax and you look at the reasoning that this Court put forward for the – for what constitutes termination of Indian treaty rights – But in that – in that decision, we did not overrule Racehorse. We said that Racehorse meant that statehood did not automatically terminate the prior treaty right – automatically – but that certain language in the Racehorse treaty was still sufficient to terminate the treaty right. And the language in the Racehorse treaty is the exact same language at issue in this treaty. What's – so why shouldn't we have the same result here that we had in Racehorse and that's the part of Racehorse that is preserved on page 207 by Mielax? Justice Kavanaugh, I don't think you expressly overruled the outcome in Racehorse, but I think that you did reject all the legal reasoning that led to the Racehorse result. I mean, you rejected the equal footing doctrine holding. You rejected the temporary and precarious approach to characterizing treaty rights, which was a premise of that second – Sorry to interrupt. We concluded that it was a question of congressional intent whether the treaty right was terminated by statehood. And we concluded that the language, the right to hunt on unoccupied lands of the United States was the relevant treaty language, was terminated by Wyoming statehood, correct? I think you concluded that in Racehorse. And that's preserved – explicitly preserved on page 207 of the Mielax opinion. That part is not overruled. And my question is, if that part of Racehorse was not overruled but was explicitly preserved and in fact distinguished from the Chippewa Treaty, how can we in this case not apply the same result that was applied in Racehorse with the exact same treaty language, which part of the reasoning is wrong there? A couple of responses. First of all, I don't know that you would be applying the result of a prior case. I think you apply your reasoning. And I think that the reasoning that you adopted in the Racehorse – I'm sorry, in Mielax was that you did not accept this idea that simply characterizing a treaty right as temporary and precarious such that it could be impliedly terminated by statehood. And I recognize that you distinguished – But we said that there were – we said unlike the treaty at issue in Racehorse, right? And then we said there was a clearly contemplated event in Racehorse unlike in the Mielax treaty. And the clearly contemplated event was the language said, hunting on the unoccupied lands of the United States, that that was terminated by statehood, right? No, I don't actually think that you actually went on and said that that particular language was terminated by statehood. You recognized the holding that Congress did not intend for that particular treaty right to survive statehood. But then you went on. When you distinguished that particular treaty, the Racehorse treaty, you actually distinguished it by recognizing the express conditions of termination in that treaty, which is unoccupied lands. Do you think Racehorse is overruled or not, the result in Racehorse? I think that you did not expressly, in hec verba, overrule the decision – Do you think it's still good law as to the tribe at issue in Racehorse? I think that if the tribe in Racehorse were here, I think that it would have to be arguing that you explicitly overruled it. But I don't think you need to do that here. I think what you would – Why not go back to Judge Kavanaugh's question? The language is nearly identical. Wouldn't we have to say that Racehorse is overruled to come to a different conclusion? How would we distinguish the two? Well, I think that you simply need to apply the reasoning that you set forth, the new reasoning in Mille Lacs, to this Crow tribe treaty, which has never been before the Court. And now if that creates, you know, a bit of a situation where you've got, you know, the Shoshone-Bannock treaty that was interpreted using old reasoning, having the right terminated, and, you know, having a – You know, Chief Justice Rehnquist – I don't know if he was chief back then – said that we had – that the majority had effectively overruled Racehorse. And so have commentators. So should we just say it? And you still haven't told me what factually is different between the two treaty provisions. Well, I can – That would distinguish them sufficient for us to say we're applying the new logic and this treaty provision fits that new logic, plus it's different from Racehorse Y. You haven't filled in that blank. Sure. And I would say that, you know, first of all, I think it would be far more unusual not to apply your controlling precedent on Indian treaty termination, termination of Indian treaty rights, to a treaty that has never been before this Court, simply because there's old reasoning to a treaty that has not been before the Court. But if you're looking for distinctions between the treaties, of course, this Court has said, including in Mille Acts itself, that you don't just look to the identical text of two treaties. You look at the negotiations, you look at the history, you look at the post-ratification history, and as we've put forward in our brief, there is nothing in either the text or the negotiations or the post-ratification history that gives any indication that statehood would have been a terminating event. What's different about the Crow Treaty, which is 1868, and the Shoshone Treaty, 1868, in terms of the negotiations or the intent? The language is exactly the same. So what's different about the intent? Well, we don't know much about the negotiations or the history of the Shoshone-Bannock Treaty, because that really wasn't addressed much in the Racehorse decision. But there are material distinctions between the history and the way that these treaties came about. For example — These two treaties? The Racehorse Treaty, the Shoshone-Bannock Treaty, and the Crow Tribe Treaty. The Shoshone-Bannock were on the complete other side of Wyoming. The treaty came about because of different conflicts with settlers. The Crow Tribe is on the complete other side of Wyoming. It's nowhere near Yellowstone National Park, which was something that the Racehorse Court was looking at as well. I mean, there are material distinctions between the way that these two treaties came to be because of the different histories between the two. But you haven't pointed to anything really specific. My concern is just that if we end up agreeing with you on the merits, we'll have a result that the same treaty language creates two different results. One, for the Shoshone, ends at statehood. The treaty right and the other does not for this, the Crow, even though it's the exact same treaty language. And I'd like, if we're going to reach that result, to be able to point to something. And what is that something? Justice Kavanaugh, I think that if there are different results there, I think that's a consequence of the new reasoning that you set out in Mielax. And I think it would be far more unusual not to apply. Sorry to interrupt. That would have been a reason on page 207 to say the Racehorse decision is gone. And that's not what we said. We distinguished the treaty language. And maybe we should have said it's gone, but we didn't. Well, I certainly think that if it gives you heartburn to have two different results because you're applying your latest legal reasoning, I think you can take the extra step. You did so in the Limbach case that we cited, in the Sonnen case. I mean, these are examples where, you know, and Limbach actually says, so that there may be no misunderstanding, we hereby expressly overrule this decision that's, you know, that we probably should have just expressly overruled before. So I think you can take the extra step. Well, how much are you going to have to unwind if you apply, you no longer believe that statehood eliminated the treaty provisions in Racehorse? Nothing, Your Honor, because there's no other State that has to — that is operating under this. There's no other State aside from Wyoming that has been free of recognizing Indian treaty rights. So that's not a consideration. And there's been no suggestion or evidence that Wyoming has ever relied on this particular Racehorse treaty in the way that it has formulated its natural resource management or in the way that it's held accountable. And I think that's a consequence of the Milak's reasoning, which is your most recent controlling precedent on interpreting the termination of Indian treaty rights. If I can reserve my time, please. Thank you, counsel. Mr. Liu. Mr. Chief Justice, and may it please the Court, if the principles of Milak apply  to this case, I do want to make clear that, in our view, it's not necessary to take that extra step. Even though these two treaties have the same language, this is a different treaty than the treaty that was before this Court in Racehorse. It governs a different tribe on different lands, and so I think this is a different   to make. And I think that this Court is still faced with the question, even though the language is the same, about whether to extend the erroneous reasoning of Racehorse to a new context. Sotomayor, please stop talking in generalities. Sure. Give me a specific in which way are the two tribes, or were their history different? Well, Your Honor, to be frank, I don't think they're – the government isn't going to be able to point to a difference in the history. We just think Racehorse itself was wrong. But I think the question is still, should you extend that reasoning to a new context? You know, one of the reasons you might want to extend it is this interest in uniformity. But I think it's important to remember that that uniformity rationale just isn't going to work here. The Shoshone-Bannock tribe, which was the tribe involved in the Racehorse decision, has its reservation in Idaho. And the Idaho Supreme Court and the Ninth Circuit for decades have said Racehorse is already a dead letter. Why do you think Racehorse wasn't overruled? I think for the simple reason, Justice Kagan, that the Racehorse treaty just wasn't before the Court in Mill Lock. Well, but it does try to distinguish it. Now, I have to say, I've read that paragraph three times, and I still really have no idea what it's talking about. But it does try to distinguish it. It has this view that there are two kinds of rights and some are – two kinds of termination points for a treaty, and some are clearly contemplated and some aren't. What it never tells you is how that distinction relates at all to the statehood question that's before us and that was before Mill Lacks. But it does – there's something in its head about how these treaties are different and why that matters. And I guess I'm looking to you to tell me what I don't understand about it. I think you're right, Justice Kagan. That middle sentence, and I think the paragraph that troubles all of us, is a distinction between the 1868 treaty that was at issue in Racehorse and the 1837 treaty that was issued in Mill Lock. But, number one, I think it's important to read that sentence within the context of everything around it, and I think everything around it makes clear that the reasoning in Racehorse is no longer good. Even that sentence itself doesn't provide any affirmative reason why Racehorse was correct. As you noted, it's just a grounds for distinguishing Racehorse. So you couldn't look at that sentence and say Racehorse actually reached the right result. In fact, if you look at the terminating events that those two sentences themselves identify as terminating events under the treaty in Racehorse, statehood isn't one of those either. It focuses on the text. It focuses on whether the land is unoccupied and still owned by the United States. That actually flows nicely from the beginning of that paragraph, which says that the inquiry should be on the circumstances that the treaty itself identifies. So I think read as a whole, this paragraph is about what the proper focus of the inquiry should be. Counsel, you are, for the government, you are walking a really thin tightrope here. You're saying that in terms of whether the land is occupied, it depends on the real question whether there are settlers there, whether there are people there. And yet you say when it comes to the Bighorn National Forest or Park, you say, well, maybe it's occupied if we, the government, say we don't want people coming on here. It seems to me that the test has to be the same for the United States property at Bighorn and for the other property in Wyoming. I think that's right, Mr. Chief Justice. We're not asking that a different test be applied to the Federal Government. Our test for whether land is occupied is whether that land has been settled. Now, it can be settled. Has been settled. It can be settled. The whole point of Bighorn is that you don't want that land settled. And that's true. By designating the land as a national forest, the Federal Government has prevented private settlement. What we're saying is that there are things the Federal Government can do, just like private settlers can do, that can result in the land being occupied. We, too, can build buildings, roads, campsites, recreation areas. How much is enough? I mean, if you have the little, you know, a little shed for the ranger, does that allow you to say, well, these, you know, 100,000 acres are occupied? No, we wouldn't say that putting a shed in one place occupies that much land. I think a good piece of guidance is our regulation, which we cite in our brief, which prohibits discharge of a firearm within 150 yards of a building or a home. And so we would consider the area. So you occupy the land if nobody can fire a gun in it? No, it's 150 yards around a campsite, a building, a residence, or other occupied area. So we would take the development of the land as sort of the anchor point, and then look around 150 yards. And that would be the land. Just so I understand, so at 151 yards, Mr. Herrera could take an elk? At 100, correct. I mean, there has to be some line that we draw between land that's occupied and unoccupied. I think there is some burden on the hunter to know where he or she can hunt. And I think seeing a building 150 yards away is not too much to ask. Counsel, along those lines, you asked for a remand for an evidentiary exploration of whether the land here was occupied. At the same time, though, you point out that the district court didn't rely on the circuit opinion. It seems there's some tension there to me. Maybe not. Maybe you can help me out why there isn't. Why should we allow a remand for that? You know, it's a new argument raised in this Court for the first time. Why should we address it at all? I think the district court – I think the State trial court in this case, to be more precise, did – was open to having an evidentiary hearing from the get-go, and it was only after the State trial court determined that the issue could be resolved as a matter of law that that evidentiary hearing was canceled. So fine. We could remand it back, but do we need to say anything about this at all? Oh, not at all. I think the government was trying to be helpful in trying to formulate some sort of test and flesh that out. All right. I've got one more question for you, then. That helps. The government says that the State retains some conservation easement here. Right. I don't know where it comes from, but you tell us that such a thing exists. At the same time, though, the treaty says that the tribe is allowed to hunt on the land until the game are gone. Right. Which seems to suggest that the white man can eliminate all the game. But now you say the Indian cannot. How can that be? I think it goes back to the basis of the conservation necessity doctrine. It is a gloss on treaty language that does not confer the exclusive right to hunt. I'd understand that if the treaty were silent about the game. Yeah. But the treaty is express, and it contemplates no conservation. It contemplates the complete elimination of the game by the white man. Yeah. So if the white man gets to eliminate the game again, counsel for the government, how come the Indian may not? I think it just goes back to the fact that these treaties are more or less written against the backdrop of states being able to exercise some conservation authority, because the right is not exclusive. I'm sorry. But that issue hasn't been raised, and it could be addressed then. We don't need to address that. You don't need to address it. This killing was on federal land, correct? Correct. In all federal parks, state regulations apply? It depends on the type of federal land. So here we're talking about a national forest land, and by statute, the state retains jurisdiction over persons in this particular national forest. OK. I just wasn't aware. It's a forest by forest and land by land determination. All right. When you say we don't have to deal with the issue of whether it's occupied, are you talking about the issue preclusion issue? No. I think the way to deal with the issue preclusion issue, Your Honor, is to conclude that that issue has been not raised or passed upon below, that either it's been forfeited or that it can be pursued on remand. The federal government would not invite this Court to address the actual merits of these various issue preclusion doctrines. We agree that these issues are difficult, and the circumstances of this case are particularly unusual, because the alternative judgment that was inserted into the case by the Tenth Circuit in Repsis was done so at the appellate level and not in the court of first instance, and not even Restatement Section 27 addresses this precise instance. So we would caution the Court against delving into these tricky preclusion issues. We do think the issue is not raised or addressed below. I think the clearest place to look for this is page 11 of the State's supplemental brief addressing the issue preclusion in the courts below. Thank you, counsel. Mr. Knepper. Mr. Chief Justice, and may it please the Court. Mr. Herrera's claims are identical to those presented 25 years ago by his sovereign on his behalf in the case Crow Tribe v. Repsis. Nothing since Repsis, including the decision by this Court in Mille Lacs, merits an exception to this Court's repeated command that once the appeals are over, a final judgment binds the parties and they may not renew the same dispute in another forum. Repsis ruled that this particular treaty right had expired, and this Court should not, on collateral review, allow it to spring back, especially as when you look at the decision in Mille Lacs, Mille Lacs went out of its way not to overrule the result in racehorse. Much of the argument over preclusion, Your Honor, has to do with whether there has been a change in intervening law, and this case is particularly ill-suited to find such a change. The treaty text has not changed. There are no essential facts that have changed, because when one looks at the underlying case brought by the Crow Tribe and the complaints in the joint appendix, it was brought at the broadest possible level of abstraction. Breyer, maybe I'm not understanding this correctly, because it's complicated. But I thought there are two separate issues in respect to issue preclusion. One has to do with Repsis, and Repsis was a case that held on your side, and there hadn't been much changes since then. But your argument, their argument about that one, is you never raised the issue. The district court never decided it. The Tenth Circuit just, on its own, wrote the thing in there. And so you forfeited that one. Now, in respect to the second and different question, it's whether racehorse bars their claim, a totally different question. And there, not with Repsis, the basic argument is the law changed in Mill Lax. It doesn't in the restatement, or where we've quoted the restatement, which we have in a number of cases, Bobby v. Bees, Limbach v. Hoeven, et cetera, we haven't said that you are free to bring a new issue only where the Court has overruled the case that came against you. We said you're free to bring a new one when there's a change in the applicable legal context. Okay? So their argument there is there is a change in the applicable legal context. One, no more unequal footing doctrine, and you win. Two, no more just become a State, and you win. Okay? That's a change in the applicable legal context since racehorse relied on those two things. Now, that's my understanding of the argument. So either tell me I'm wrong and explain what the correct argument is, or answer those points. Okay. Your Honor, there's not complete clarity within this Court's jurisprudence as to what kind of a change in the legal context is sufficient. Some say, you know, Stouffer Chemical talks about a significant change or a major doctrinal shift. The, you know, the language in Bobby Beebe says just a change in the applicable law. From the State's perspective, if any change to a precedent relied upon by a prior court, either it's called into question by this Court or it's called into question by a court of appeals, in some subsequent cases is sufficient to undo the preclusive effect of the first opinion, then I think there are very few cases that will have that effect, because, you know, one need only go through the opinion and say, well, this case was cited by the court somewhere, and by citing that case, they must have relied upon it, and boy, look over here, there's another case that has questioned it, not even necessarily overruled. Kagan. Kagan. I think this isn't just any change. I think a fair reading would suggest that what Millax did was to repudiate the reasoning that Racehorse had in it with respect to exactly the question before us. And it's true that it did not go all the way to overruling the case, but it came up like half a step short of that. It basically said the case was wrong, and then it found some distinction that wasn't even relevant to the question and said we don't have to overrule it because there is this distinction, but all the reasoning is repudiated. Wouldn't you think – wouldn't you say that that's right? Your Honor, the Court did not overrule the approach to treaty interpretation. It said the key is looking at what the intent of the parties is. It reached a conclusion that a court today might not reach. It might reach a different conclusion. But that argument that the Court should have said something different is at root the argument that the Court – that the decision was wrong. But just to make this more concrete, I mean, as I understand it, Racehorse essentially said that these treaty rights expired upon statehood, and Millax comes in and says that's a wrong thing to say. Treaty rights don't expire upon statehood. So that seems like a pretty relevant change in the law. Your Honor, there's – there's one subtlety, I think, from the 19th century law to the 20th century law that's being overlooked here, and that is this Court's decision in Lone Wolf v. Hitchcock. It was not until 1903 that any party believed that Congress could unilaterally overrule or repeal a treaty, that the assumption in the 19th century was there had to be bargain for consideration. And so the Racehorse Court, when it's looking at this treaty question, is saying what was the intent of the parties? And it reaches the conclusion that the intent of the parties was, and this is stated from Millax, that this was a – it was clearly contemplated that this would be a temporary hunting right so long as the hunting grounds remained unoccupied and owned by the United States, and that that terminated at statehood. Now, it was not terminated by – it was not so much that the statehood as a legal act made it terminate. It was that the treaty itself envisioned termination at statehood. And because the parties agreed that it terminated statehood, the treaty did so. The oddity is that, as Justice Kagan says, in Millax we say that the holding of racehorse or the reasoning that statehood automatically terminates treaty rights for off-reservation activity, that's no longer good. And then on the alternative holding, as we characterized it from racehorse, we say that language, the temporary and precarious, that language is also no good, right? Even on the alternative holding, it's not as if the court in Millax said, oh, everything from racehorse is good on the alternative holding. It either ditched it or recharacterized it, something. How would you make sense of what the rule is that's preserved by Millax? I think, Your Honor, the rule preserved by Millax is that the treaty language that was present in racehorse, which is identical to the treaty language in the – the treaty with the Crows, expresses an intent by the parties that the off-reservation hunting right would terminate its statehood. Breyer, you have this language right here in Millax, treaty rights are not impliedly terminated upon statehood. The racehorse decisions to the contrary was informed by that Court's conclusion that the Indian treaty rights were inconsistent with State sovereignty. And then it goes on to say that's not so. I mean, I could read it to you, but isn't that what it says? And so treaty rights are not implied. Now, that would seem like a change in the law, because they said in racehorse treaty rights were impliedly – the Indian treaty rights were impliedly repealed by statehood of Wyoming. I mean, I don't see how you can get more opposite. You tell me now. Your Honor, I think there are – the critical question, and this sort of goes to what the text of Article IV speaks of, which was, you know, and I may refer to racehorse several times, not just because it's binding precedent, but also because it's the clearest evidence that we have before us of what 19th century thinkers thought the language meant. In other words, it has a – it has a historical value as well. All of these decisions were made during the 19th century. And the Court in that case looked at the treaty text and said, unoccupied lands, that could be construed broadly, it could be construed narrowly. But when construed in pari materia, with the language of borders of the hunting districts, it applies only to lands of such a character as would be embodied in hunting districts. And the Court read that as a term of art. Sotomayor. So that's wonderful. Tell me how a national park isn't a traditional hunting district. I mean, the government says we're not going to keep it unoccupied. They open it up to hunting. What was different back then? Your Honor, I – that's – Unoccupied and people went hunting. Well, Your Honor, that's where the racehorse court's evaluation of the history at the time is so important, because the racehorse court looked at Yellowstone National Park. And what the racehorse court said was Yellowstone National Park was created almost immediately after the treaty with the Crows was signed. The Yellowstone National Park is actually within the Crow hunting district, and the Crow hunting district is a very large area. But Yellowstone National Park, which is an area the size of Connecticut, it's not just geysers, was carved out of the hunting district. And then the United States proceeded over the entire time, beginning in 1872 and then through the 80s, in the 1880s, to say to tribes, you may not hunt here. This is off-limits. We have occupied this land. Now, that doesn't mean that there are structures there, but that the – that the Federal Government's arrival and the Federal Government setting this land aside has the effect of occupying the land, and that the tribe does not require or the treaty does not require only that the tribe refrain from hunting only on land where it can identify a structure. Can we get Mr. – Well, I know – oh, I'm sorry. I know that when we're interpreting a treaty, we look at the background and circumstances in interpreting the language. But your argument's a pretty stark distinction. Occupied doesn't really have anything to do with hunting, and yet your sort of saying, well, when they said occupied, they meant outside the hunting district. And that's a bit of a stretch. I know we try to look at the background to illuminate the language, but here it seems to me you're just substituting an entirely different concept. Your Honor, I think that the precise question is what did they mean by occupied and what was land – what did land have to look like? But your argument is, you know, what did they mean by cow, and you're saying they meant horse. They're two totally different concepts. I'm not sure that's what the State's argument is. But I think there are – you can envision, for example, a piece of private land where there is no – there are no structures, and in that piece of private land, there – I think there's no question Mealox affirms this, that there would be no right to hunt on that piece of private land, even though it looks like nothing. It looks like a vast expanse of nothing. And so then the question is, when the government has a specific purpose for which it reserves land, and the government has done so and did so throughout the 19th century in terms of military reservations for forts, which is a larger portion of land than just the fort itself, as well as public reservations, which would be either the national forest or the national parks, the government has said not that this land is unoccupied, but rather we occupy this land. This is our land. We dictate who comes in, who comes out, what they're allowed to do while they're there. We have taken this land over and managed it in a completely different way. From the State's perspective, it's one of the reasons why we're not concerned about some of the questions of whether Mr. Herrera — whether the United States could solve this another way. In other words, this is a national forest. The current regulations for the national forest say you can only hunt in the national forest if you have either permission from the forest superintendent or you're hunting in conjunction with a State memorandum of understanding. The State memorandum of understanding for the Bighorn National Forest makes no reference whatsoever to hunting outside of Wyoming's permitting regime. Now, if the United States wants a different regime on its property, the United States is free to provide that different regime and free to make distinctions. And — Roberts. Counsel, can we return to an area where we might at least be able to nail down some agreement between the parties? And that is, your argument rests largely on issue preclusion. And you've made an impassioned defense of race worse, and an excellent one. But what kind of change in law is sufficient to render issue preclusion inapplicable? Is it a substantial change in the law? Is that the test you'd have this Court use? Is it a change in the law? Would you require a formal overruling in so many words? What is the State's understanding of the appropriate test? Your Honor, from the State's perspective, that entire concept gives us a great deal of pause. Well, you're the one who's invoked it, though. I mean, you invoked issue preclusion, all right, as the primary argument in your briefs. So I think you owe us an explanation what standard you'd have us apply. Your Honor, I think the — from the State's perspective, it needs to be a — both a major doctrinal shift. Okay. That's the test? Major doctrinal shift? Thank you. All right. If I could — Is that it? You sound like you're mid-sentence to me. Well, Your Honor, I wanted to explain one of the reasons why the State is so concerned about this concept of change in law, especially in the context of Indian treaties and jurisdictional questions, because I think the greatest reason for caution here is we have two eternal sovereigns. The Crow tribe will be here forever, as they have been since time immemorial, and the State of Wyoming has no intention of disappearing. And our concern with sort of a — with sort of a notion that the change in law is all that's necessary to remove preclusion is that it creates the possibility that people — that parties just lurk, that they wait and wait. And, you know, the doctrine in a specific area of law may not change over 10 or 20 or even 100 years, but when you have two parties that will continue to exist for more than 10 or 20 years, you're going to see that. But you have this racehorse. It says, your side, for two or three reasons. Reason one, the equal footing doctrine. Reason two, they became a State. And if there is a reason three, it's related to the second. Along comes Millox, and it says reason one is no good. We think the opposite. Reason two is no good. We think the opposite. Reason three we think isn't any good either. We think the opposite. And therefore, racehorse doesn't bind us. Now, there's possibly — they should have added a fourth thing, and therefore the words racehorse is overruled. But the Court didn't. I can understand that. I can perhaps understand that better than you. There are a lot of things to do every day. And you have to write your opinions, and you start putting in a word like overruled, and some of your colleagues might think, don't do it, you don't know where you're getting, et cetera. All we have to decide for this case is that racehorse doesn't bind us. Okay? So maybe we should say racehorse is overruled. But the three big reasons — now, are they little reasons or big reasons? I would say the equal footing doctrine is a major change to deny that. I would say to deny that they lose their territory when they come to the State is a major change to say, no, that isn't so. And therefore, I thought maybe it fits within what you're talking about. It has to be a fairly big deal in change. It sounds like a big deal. And then you have another argument, which is, of course, we'll get to, perhaps. It's not unoccupied. And there it's, oh, more open, but you have the problem that the treaty is filled with that word unoccupied, seeming to mean not occupied by white settlers. And that's what the government thinks. Well, the language in the treaty is supporting that. And are there any white settlers in that park? No. Not one. To my knowledge, maybe there's a gameskeeper. But, see, okay. So that's how I'm understanding your case. I thought I'd spell it out. And now you say what you would like. Thank you, Your Honor. The question for this Court, of course, is not just racehorse, but what repsis says, Your Honor. And repsis does not rely at all on the equal footing doctrine. Repsis mentions that there is an equal footing doctrine and drives right past it. It does not say that, on the basis of the equal footing doctrine, that the treaty with the Crow's hunting right has expired. Instead, it looks to what did — what does the treaty mean, and the treaty was intended to expire upon statehood. The language that repsis specifically, the Court concluded that the right conserved by the treaty with the Crow's was a temporary imprecarious. It was not a continuing right. That's — that is treaty interpretation. And when one looks at Milox, Milox does not question or even overrule that approach to treaty interpretation. It says statehood does not, independent of whatever the treaty text says and whatever the treaty means, automatically terminate. Sotomayor So tell me what in the treaty says it automatically terminates. I saw a lot of conditions. I saw the game disappearing, the land becoming occupied, but I don't see on statehood or even anything approaching it. Where in the — just point me to something in the treaty language that gives you — Verrilli, it rests on the conclusion that unoccupied lands must be of the character of the lands denominated as hunting districts, and that hunting districts were a specific kind of land understood, and that upon settlement — and, you know, there's a process, but culminating in statehood — Sotomayor Who gave — whose settlement? Tell me the settlement history. Verrilli, non-Indian settlement. Sotomayor All right. And non-Indians settled how? By grants by the Federal Government, correct? Verrilli, It wasn't so much grants. Non-Indians came into an area and then used it, and then under the Homestead Act, they would file for patents with the General Land Office, allowing them to turn certain amounts of — Sotomayor Who ran the General Land Office? Verrilli, The United States. Sotomayor Okay. So if the United States had changed the General Land Office to some other method which they have, that terminated the treaty? Verrilli, I think that — if what you're asking is are there unoccupied lands within the meaning of the treaty anymore within the State of Wyoming, that's what the decision both in Racehorse and in Reps has concluded, that those lands have disappeared.  Can I ask about the practical consequences of the decision? Because, as Justice Gorsuch said to the opposing counsel, there is still preserved in the cases a right in the State to regulate in the interest of conservation. Doesn't that mitigate and maybe solve the concern that you talked about with the State existing forever and the tribe existing forever, the way they can coexist? The State still retains a right to regulate in the interest of conservation. Why isn't that good enough? Verrilli, Your Honor, conservation is not a middle ground from the State's perspective. And the chief reason is because the law enforcement officers who act don't know whether they have jurisdiction until after they have done so. So in other words, we have an officer out enforcing law in either an area or in a certain circumstance, and the question is, he or she acts, and then only after a period of litigation does he actually find out that he had the authority to do so. I don't follow that. Because if we were to adopt the proof of the conservation principle that the government and Congress does, too, you would have your game wardens out and about ensuring that people are not hunting during off-season, for example. And if they're allowed to go on the forest land by agreement with the United States, why then how would there be any ambiguity about their capacity to issue citations? I'm just not clear about how litigation would be required to resolve that. Your Honor, leaving aside the question of whether there's agreement with the United States, right, that obviously solves all problems. But assuming that there's not agreement with the United States, we're solely acting as a matter of State power, not delegation. Well, that's a problem you have without respect to this case, right? I mean, either the government allows you to do that or it doesn't allow you to do that, and that has nothing to do with anything before us, right? Well, the Congress in this case has given the State the authority to act. Right. So, okay. So we can put that one aside. So, again, what ambiguity remains in response to Justice Kavanaugh's question? You know, the current vision of conservation necessity, which has not admittedly been decided by this Court in any time recently, is sort of a reverse preemption doctrine. It's essentially that the State is pushed out of an area of traditional State concern, and then the burden is upon the State to show that it has the need to come in and only after sort of demonstrating at the end of it that this particular activity, be it a – But is it just a timing issue, then? Because – or is there some gap between what you want to regulate and what you can regulate under the conservation interest? Your Honor, there are significant gaps. Okay. And what – give me some examples so we can understand the practical consequences. The most important, Your Honor, is safety. Hunting seasons are specifically limited in time. That not only protects the wildlife, but it has two effects beyond that. It ensures that when people are recreating in the national forest or anywhere else outside of that time period, there is no – you know, individuals who are using firearms at that point have very, very little justification for doing so. And so there are people, and I'm one of them, that won't take our children into the national forest during hunting season because there are risks there that are too much to overcome. There are limits in terms of when you can fire your firearms. It has to be at certain hours of the day. There are requirements that if you are hunting, you are wearing vests so you're clearly visible to one another as well as to – as well as to third parties. Beyond sort of the immediate safety concerns, which are not embodied in conservation necessity, there are disease management concerns. When an individual takes an elk or a deer in conjunction with a State license, the Fish and Game Department will take a sample of that animal and use it to determine whether diseases like brucellosis, which can be caught both by wild game animals as well as by human beings, are present. There are also – Isn't that covered by conservation? Your Honor, I don't – I mean, conservation necessity to my sense has always been about ensuring that the game exists and preventing its extermination, not the sort of – Doesn't disease interfere with that? In some cases it can, Your Honor. In others, you know, the bison who have brucellosis seem to be able to function just fine within their reproductive capacities. It's domestic cattle that cannot. In many other Indian cases, the language has been used that ordinary regulation is not foreclosed, which sometimes is elaborated. Health, safety, environment, for example. And is there any reason that that would be different here? Your Honor, if that were the theory and that the theory were that it – The theory in all the Yamaha cases, I mean, that's what I've been looking at. You know, from the State's perspective, what we're looking at is the sort of extensive litigation that we have not yet engaged in, but also what the United States suggests in its brief as sort of the approach that it would take to conservation necessity, which suggests, for example, that different levels of mule deer population or elk population on a year-by-year basis would affect the interests of the State in conservation. But if safety were added, as Justice Breyer said, that solves the primary problem you identified, right? It certainly solves at least one of them. There are, you know, there are other questions. You're forgetting the other side in this discussion, because the tribe has a subsistence right. I know under the facts of this case you're claiming the killings were not for subsistence. Open question. I'm not taking a side on that. But assuming that the treaty right was given to protect the Indian subsistence rights and that their claim, taking it at face value, is accurate, that they were on hard times and needed food to feed their families, that balance is not yours alone to make. It belongs to the government and it belongs to the Indian tribes as well. Your Honor, that's why the State has been so accepting. I mean, the State does not resist the notion that as proprietor the United States could come in and give all of the benefits that Mr. Herrera seeks, including subsistence hunting. What the advantage of that approach would be is that all of the questions that sort of tail out of that, when, how, but also subsistence, subsistence for whom, you know, the question of hunting licenses being given to the tribe, rather than under the current situation where, you know, the United States position as to the Crow Treaty was not made clear to the State of Wyoming until the filing in this court in support of a grant of certiorari. The United States had no role whatsoever in the repsis litigation that we can find. In fact, I believe the United States declined to participate at all. And so from the State's perspective, the absence of the Federal Government is one of, you know, we would welcome the Federal Government's involvement. On the landing question here, what is the extent of the Federal Government's regulatory authority and where does it come from? The Federal Government's regulatory authority comes from the Organic Act that created the national forests. There's a gap. There was a statute allowing creation of the national forests. And then when they were reaffirmed in 1897, the so-called Organic Act allows the Federal Government to just do just about anything. And in the Coastal California Commission, this Court said it's plenary. Alitoson, does the government think that that abrogated or that limited the treaty right? I think the government's perspective is that it did not. The State's perspective is that it occupied it by taking all of it. Well, then how can the government? I mean, the government is just as bound by the treaty. The government entered into the treaty, right? The government entered into the treaty, yes. So doesn't there have to be a statute that would limit the hunting right that was conferred by the treaty? Your Honor, may I respond? Sure. All of these actions took place, Your Honor, before statutes could repeal Indian treaty language, including the enactment of the organic statute. So from the State's perspective, all of them represent not repeal of the hunting right, but rather the Federal Government's occupation within the meaning of the hunting right. Thank you, counsel. Mr. Hicks, two minutes. Thank you, Mr. Chief Justice. Just a few points. First, in response to the idea that MILAC simply didn't change the approach, I think that's wrong for all the reasons that Justice Breyer and Justice Kagan identified. But I want to go a little bit further than the sentence that you read, Justice Breyer, and it's the sentence on page 207-208. Now, earlier in the opinion, the Court had said, We concluded that the particular rights in the racehorse treaty at issue there were not intended to survive statehood. Then on 207-208, the racehorse court's decision that Indian treaty rights were impliedly repealed by Wyoming statehood was informed by that court's conclusion that the Indian treaty rights were inconsistent with State sovereignty over natural resources, and thus that Congress could not have intended the rights to survive statehood. And that's an important last phrase of that sentence, because it's tying the entire racehorse holding to this mistaken premise that Indian treaty rights are irreconcilable with State sovereignty over natural resources. I think that's a key sentence, and I think, frankly, that kind of undercuts a lot of the idea that even the holding, this second holding of racehorse is still viable. Again, we don't think you need to take the next step to expressly overrule the outcome in racehorse, but if you, you know, want to do that, you can follow the road map that you have in Limbach and Sonnen, where you had almost exactly this situation. Second point is simply to this idea of the occupation and what occupied means. Everything in the evidence, in the historical evidence, is that both parties to the treaty understood occupation to mean some sort of actual physical presence, and nothing about simply a legal declaration that the Federal Government was going to do something. And certainly under the Indian canons of construction, that's a reasonable reading that is entitled to be given to the Indians. And the last point on conservation necessity, you know, this discussion I think just demonstrates that if the Court finds that the treaty right is valid and has not been terminated, Wyoming still has the ability to regulate its wildlife, its natural resources, simply according to the conservation necessity standard like every other State already has to do. Roberts. Thank you, counsel. The case is submitted.